(20 App. Div. 53.)

### MAY et al. v. BERMEL et al.

(Supreme Court, Appellate Division, Second Department. July 13, 1897.)

COUNTY SUPERVISORS—AUTHORITY TO BORROW MONEY.
    Under section 69 of the county law, as well after as before its amendment by Laws 1896, c. 178, it is not required, in order to authorize the passage by the board of supervisors of any county, including the county of Queens, of a resolution permitting a town to borrow money to build or repair highways or bridges, that a majority of the highest number of votes cast for any officer or on any proposition at the town meeting at which the bonding proposition is voted on should be cast in favor of such proposition; but it is sufficient if a majority of all the votes cast on such proposition is in its favor,—at least, if the vote thereon is a substantial one.

Appeal from special term, Queens county.

Action by Henry May and Michael Levy against Joseph Bermel and others. From a judgment in favor of defendants (45 N. Y. Supp. 913), plaintiffs appeal. Affirmed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Ira Leo Bamberger, for appellants.
Townsend Scudder, for respondents.

HATCH, J. The purpose of this action is to restrain the delivery by the defendants of $620,000 in bonds of the town of Newtown, authorized to be issued in pursuance of a vote of the trustees of the town, and of a resolution of the board of supervisors of the county of Queens. It is disclosed by the record that at a regular annual town meeting of the town of Newtown for the election of town officers, and for the transaction of other business of the town, held on the 6th day of April, 1897, there was submitted to the electors voting thereat a proposition to bond the town, and borrow money thereon, for the purpose of improving the highways in said town. No claim is made but that all of the statutory requirements were observed, leading up to the taking of the vote and the passage of the resolution authorizing the issue of the bonds by the board of supervisors. The defect in the proceedings, if any, lies in the fact that the vote authorizing the issue of the bonds was not a majority of all the votes cast at said town meeting. It appears that the whole number of ballots cast at such election for a town office was 3,753. The whole number of ballots cast upon any submitted question was 3,500. The whole number of votes cast and

counted upon the bond proposition, the subject of this controversy, was 2,957, of which "Yes" received 1,650, and "No" received 947. The number of ballots cast and counted where there was no vote upon the bond proposition was 903. The result, therefore, is that, of the whole number of votes cast and counted,. the bond proposition failed of obtaining a majority of the electors who voted for the town offices receiving the highest number of votes. It did, however, obtain a majority of all electors who voted upon the bond proposition. We come, therefore, to a consideration of the vital question in the case: Was it required, in order to authorize the resolution passed by the board of supervisors, that a majority of all of the votes cast and counted for the highest town office should have been cast for the bonding proposition, or was it sufficient that a majority only should be had of those votes cast and counted upon the proposition to bond? The answer to be given depends upon the construction of the statute under which the vote was taken. The statute upon the subject, prior to its amendment in 1896, is found in section 69 of the county law (Laws 1892, c. 686), and reads as follows:

"The board may, upon the application of any town or towns liable to taxation for constructing, building or repairing any highway or bridge therein, or upon its borders pursuant to a vote of a majority of the electors thereof at any annual town meeting, or special town meeting called for that purpose, or upon the written request of the commissioners of highways and town board of such town or towns, authorize such town or towns to construct, build and repair such highway or bridge, and to borrow such sums of money for and on the credit of the town as may be necessary for that purpose, and to lay out. widen, grade or macadamize such highway, or to purchase for public use any plankroad, turnpike, toll-road or toll-bridge in such town or towns, and may authorize the company owning the same to sell the same or any part thereof or the franchises thereof, or to pay any debt incurred in good faith by or in behalf of such town or towns for such purpose. If such highway or bridge shall be situated in two or more towns in the same county, the board shall apportion the expenses among such towns in such proportion as shall be just."

This section provided for two contingencies in which a town might be authorized to borrow money and issue its obligations therefor: First, upon application made to the board pursuant to a vote of the electors of the town; second, upon the written request of the commissioners of the highways and the town board of the town. This remained the law until 1896, when this section was amended. Laws 1896, c. 178. While the phraseology is changed in some slight particulars by the amendment, it remains, so far as important to any question presented by this case, precisely as it formerly stood, except as there is added to such section this clause:

"But in the county of Queens a vote of a majority of the electors of any such town or towns, voting at an annual town meeting, or special town meeting called for that purpose, must first be obtained before the board can authorize such town or towns to borrow any money for, or on the faith and credit of such town or towns for the purposes above mentioned."

The only substantial change worked by this amendment is to require that in the county of Queens no resolution shall be passed by the board of supervisors pledging the credit of the town, except there be a vote of the electors of the town authorizing the same. The only change which could in any view otherwise affect the construction of the amendment arises out of the addition of the word "voting" at an

annual town meeting, in substitution of the language, "pursuant to a vote of a majority of the electors," etc. The result would be the same upon a vote in either case. If a majority of the whole number voting is required by the words in one case, it is in the other. If, at an annual town meeting, a majority of all who voted for any given office did not vote upon the special proposition, but a majority was obtained of those who voted thereon, in a sense it could be said that such votes did not constitute a majority of the electors at that town meeting, and therefore there was no vote by a majority of the electors. The answer is that the statute contemplated a majority who vote upon the proposition submitted. We do not think that by the addition of the word "voting" any change was contemplated in the number of the electors who should vote, or that any other method of determining such majority was intended to obtain. How this vote should be taken, and when, remains precisely the same in the amended section, is preserved in substantially the same language, applicable to counties generally, and no reason is suggested why these words should receive any other or different construction when applied to the county of Queens than when applied to the other counties of the state. If there had been any intention to work a change in this respect, undoubtedly the legislature would have used language indicative of such intent. The change that was worked is clear, definite, and precise, leaving no room for cavil or question, and this consisted in the omission of authority to act upon the request of the commissioners and the town board. The change in phraseology does not indicate an intent to change the law, in the absence of substantive language or circumstances indicating that a different rule was intended to be established. Davis v. Davis, 75 N. Y. 221. We are therefore to consider the construction of this language in connection with section 69 as a whole, together with adjudications which have been had upon similar statutes, as there are none construing this particular section. The language is: "A majority of the electors of any such town or towns, voting at an annual town meeting, or special town meeting called for that purpose." If there had been a special town meeting called for this purpose, it could not be contended but that a majority of those who voted would control, even though a majority of the electors of the town did not attend or vote, or if a majority of the electors who attended such meeting did not vote upon the question, or that more blank ballots were cast than affirmative votes. If this would be true as to the special election, it is somewhat difficult to find a substantial reason why it would not be equally true of an annual town meeting. It is a fundamental proposition in our theory of government that the majority shall control, and the usual way in which such majority is evidenced is by giving all an opportunity to vote, and then counting such as vote affirmatively and such as vote negatively, the difference between the two constituting the majority. Those who fail to vote and those who cast blank ballots are not considered, in determining the result, in the absence of some statutory authority which provides a different method, or commands the determination of a majority, based upon the whole number entitled to vote. Such was the rule at common law. As was said by Lord Mansfield:

"Whenever electors are present, and do not vote at all, * * * they virtually acquiesce in the election made by those who do." Oldknow v. Wainwright, 2 Burrows, 1017–1021.

And the rule is the same in relation to elections held under general or special laws, in the absence of statutory regulations to the contrary. Cass Co. v. Johnson, 95 U. S. 360, where it was said by the chief justice:

"All qualified voters who absent themselves from an election duly called are presumed to assent to the expressed will of the majority of those voting, unless the law providing for the election otherwise declares. Any other rule would be productive of the greatest inconvenience, and ought not to be adopted unless the legislative will to that effect is clearly expressed."

In this case the court held that a statute which provided "that not less than two-thirds of the qualified voters of the township voting at such election are in favor of such subscription" was not repugnant to a constitutional provision of the state providing that the general assembly should not authorize a town to become a stockholder, or loan its credit, "unless two-thirds of the qualified voters of such county, city or town, at a regular or special election, to be held therein shall assent thereto." In Carroll Co. v. Smith, 111 U. S. 556, 4 Sup. Ct. 539, the court considered the effect of a similar constitutional provision, using this language:

"The assent of two-thirds of the qualified voters of the county, at an election lawfully held for that purpose, to a proposed issue of municipal bonds, intended by that instrument, meant the vote of two-thirds of the qualified voters present and voting at such election in its favor, as determined by the official return of the result. The words 'qualified voters,' as used in the constitution, must be taken to mean, not those qualified and entitled to vote, but those qualified and actually voting. In that connection, a voter is one who votes, not one who, although qualified to vote, does not vote."

To the same effect is St. Joseph Tp. v. Rogers, 16 Wall. 644. Such, also, is the rule applicable to private corporations. Field v. Field, 9 Wend. 395; 1 Mor. Priv. Corp. § 476.

It was said by Chancellor Kent that the same principle prevails in incorporated societies as in the community at large, and that acts of the majority, in cases within the charter power, control; the "majority" meaning the major part of those present at the meeting who act. 2 Kent, Comm. (14th Ed.) 293. We think, also, that the reasons assigned by the court in Smith v. Proctor, 130 N. Y. 319, 29 N. E. 312, logically carry the construction of this statute to the same result. Counsel for the appellant relies upon People v. Trustees of Village of Fort Edward, 70 N. Y. 28, as establishing a contrary doctrine. It is to be observed that this case arose under an act authorizing towns to bond in aid of the construction of railroads. The courts of this state in construing these statutes have uniformly held that a strict compliance with the statute was essential, as the purpose of such legislation involved an incumbrance of the taxable property of the town, in aid of a private enterprise. Such expenditure of public money or pledge of public credit was quite foreign to any purpose of governmental expenditure for the public good, and came in time to meet an absolute constitutional prohibition, based upon principles of public policy. The case is clearly dis-

tinguishable from the present statute. The railroad act authorizing the town to bond required that the "taxable inhabitants of said village may at such meeting, by a majority vote, decide to raise a sum not exceeding $20,000, for the purposes provided in the act." And further: "In case a majority of said taxable inhabitants shall vote to raise such sum for said purpose," etc. It is noticed that the right to incur the debt is limited to a specific class of inhabitants (i. e. those who were to pay the debt); and it is clear, as the court held, that the object of the statute was to obtain a majority expression of such persons before a debt could be saddled upon them, and would be satisfied with nothing less. In the present case the object of the expenditure is for a purely governmental purpose, which inures to the general good of the public at large. The right to vote upon the proposed expenditure is not limited to any class of citizens, but embraces all qualified voters. The distinction between the two cases is plain and radical. One seeks to pledge the public credit for private ends, which is opposed to public policy; the other seeks to create better conditions for the enjoyment of all citizens. The first leads the courts to a strict and literal construction of the law; the second relaxes the rule, and invites a liberal view. One is opposed to the public policy of the state; the other is her handmaid, leading to the public good. Many cases arising in other states are cited by the learned counsel for the appellants, and others might have been, where the courts have adopted the view opposed to the one which meets our approval, as above expressed. The authorities, it is conceded, are not in harmony, and in at least one state the view of the court is not in all respects in harmony with itself. State v. Winkelmeier, 35 Mo. 103; State v. Mayor, etc., 37 Mo. 270. We do not attempt to reconcile what is irreconcilable. There is no want of harmony in the decisions of this state, so far as they have gone, and we are led to the conclusion that the reasoning of the cases we have cited expresses the correct rule of law. Extreme cases may be supposed where a technical majority might exist, and yet where the court would feel constrained to hold that the statute had not been complied with. If only one or two votes should be cast upon a proposition, and those for it, in a case where there existed thousands of electors, the court might well hold that there had been no expression by the people upon the subject. Such cases are not likely to arise, and such is not the present one. Here the vote was large, and the majority substantial. This prompts us to say that the statute was satisfied, and the resolution of the board was authorized by a majority vote of the electors who voted upon the proposition to bond at the annual town meeting.

The judgment should be affirmed, with costs. All concur.