International Organization Master, Mates and Pilots of America v. International Organization, etc., Inc. (No. 1)

*Freedman, Landy & Lorry*, for plaintiffs.

*Wilderman & Markowitz*, for defendants.

Bok, P. J., September 17, 1955.—There are various matters before me.

One is plaintiffs' motion to consolidate, for purpose of trial, the proceeding captioned above with

another proceeding captioned as C. P. 6, December term, 1950, no. 6852. This motion is denied because there is nothing to consolidate. Judge Flood's decree nisi in the 1950 case is alive and open. It is a matter of record in this court and we can take judicial notice of it. The testimony in the instant case is completely different and is based on matters arising after January 1, 1953. To grant the motion might have the effect of consolidating the testimony taken in the two proceedings, and that could lead to confusion.

Exceptions to Judge Flood's decree nisi, dated March 20, 1951, were withdrawn, and the parties must therefore live with the decree until someone makes a move to terminate it. No such move has been made as yet.

The issue, so far as the old decree is concerned, is raised by plaintiffs' petition to attach the persons of defendants Atkins and Weinstein, as being in contempt of Judge Flood's decree. This petition is denied because the asserted contempt is based upon matters arising almost two years after Judge Flood's decree and in no way relating back to the 1950 case. In addition, the charges brought now against plaintiffs by defendants have been to a degree sustained, as I shall later show. On both counts, therefore, it cannot be said that defendants Atkins and Weinstein have acted in contempt of the old decree.

The instant case arises out of a complaint in equity brought by local 2 of the union of Masters, Mates and Pilots against its International Organization, asking a preliminary injunction to restrain defendants from interfering in the local's affairs and to restrain defendants' trustee from assuming the management of the local.

To this complaint defendants have filed preliminary objections. One, that the action was not properly titled, has been corrected by amendment and was not

further pressed. Two, that the complaint did not contain a copy of the international's constitution, has not been pressed; it was pleaded in plaintiffs' petition to attach for contempt and hence was effectively before me, and it was offered in evidence without objection. Three, that the complaint contained impertinent, scandalous and irrelevant matters, has merged in the flow of battle and has not been further pressed.

Of the remaining objections, two are directed to the point that plaintiffs have failed to aver or prove that they have exhausted their remedies and appeals under the international constitution before taking court action. This is based on article XVIII, sec. 6, of the constitution, under which the specified internal remedies are an appeal to the international executive committee or to the next convention of the membership. Plaintiffs filed this complaint and later filed their internal appeal. The answer to this objection is twofold. One, that by proceeding on the merits and offering a defense before me, defendants have effectively waived the constitutional requirement. It is to be noted that whether or not they raised the same objection before Judge Flood, they later withdrew their exceptions to his decree. Two, the constitutional requirement is unreasonable in the circumstances. It seems useless to expect a successful appeal to the very committee that has recently taken the action appealed from, and counsel agree that the next convention is scheduled for May 1956. These two factors would completely hogtie a local, since article XVIII, sec. 3, requires that pending the internal appeal the order appealed from remains in effect and must be obeyed; there is, in short, no stay of proceedings. In a matter as vital to a union as jobs and their proper distribution, I should be doing less than equity to insist that the local pursue its obviously ineffective internal remedies. Finally, objection is made that because no property rights are involved, the

court is powerless to meddle in the internal affairs of a union. What I said about waiver above applies equally here, since both sides seem equally anxious to arrive at a decision on the merit. And if jobs and their proper distribution are not tantamount to property rights, within the equitable view, it is hard to imagine what would be in a case like this.

The preliminary objections are all overruled and defendants are directed to file an answer to the complaint within 20 days. In the alternative, counsel may stipulate that the testimony taken before me be considered a final hearing on the complaint only.

Coming to the merits of the complaint, all counsel agree that the local was wrong in resisting the clear right of the international president to direct an investigation. Such investigation will therefore be ordered.

The most important point concerns the appointment of Mr. Weinstein as trustee. That there was cause for appointing him is clear, on two counts. One is that the local resisted the investigation. The other is, and I so find, that the "night mate" list and to a lesser degree the "offshore" list were inadequate. Apparent favoritism resulted on the face of the evidence, there being five men in the "ore ships" who got substantially more jobs than the others during the years 1954 and 1955. Jobs are the life blood of a union, and the even distribution of jobs is one of the reasons for a union's existence. Evidence about the five men came from the shipping company's records. It is impossible to pick up the local's lists and determine from their face who got which jobs, and when, or why a man was skipped in the rotation of jobs. Such records should be water-tight against any reasonable challenge and should be self-explaining. Since the records themselves provide such obvious justification for a trustee, I need not pass upon the other charges brought against the local, since I do not care to overweight the investigation which must take place.

The one remaining question is whether or not Mr. Weinstein was properly appointed under the technical voting provisions of the international constitution.

Plaintiffs raise various objections to the way the voting was done by the international executive committee, whose job it was.

One is that a Captain Haviland should not have voted. This man represented a local of "unlicensed" personnel, whereas plaintiffs' local consists of "licensed" personnel. Article XXV, sec. 5, of the constitution provides that a delegate representing unlicensed personnel shall have "voice and vote on matters pertaining to his class of work". The argument is that Haviland had no right to vote on a matter affecting a licensed union. I regard the argument as fallacious, since the vote had nothing to do with "class of work" but with the appointment of a trustee, a thing that could happen equally to a licensed or unlicensed local.

Objection is made that Captain Atkins, international president and chairman of the international executive committee, had no right to cast the deciding vote on Captain May's amendment. This was less an amendment than an original motion to clear local 2 and take no action against it. The vote (including Haviland's) was four to four, with two abstentions.

The constitution provides, in article XIII, sec. 3:

"In case of a tie vote other than a roll call, the International President shall cast the deciding vote."

It is my view that the vote in question was not a "roll call". The fact that it took that form is not determinative of its true character. I believe that roll calls refer to voting in conventions and not in committee. If it were held to apply to committee voting, any member could insist on a roll call if he felt it were to his interest to prevent the international president from voting. The president might decline and insist upon a voice vote. The member might then move that

the vote be by roll call, but would the vote on *that* motion be by voice or roll call? This could be kept up indefinitely, and I do not think that it could have been intended to put such a difficulty in the path of a committee as important as the one with crucial executive capacity. I therefore hold that Captain Atkins had the right to cast the deciding vote.

The crucial question is whether there were enough votes to "consent" to the appointment of a trustee.

Article XI, sec. 1, of the constitution names the personnel of the international executive committee and adds, "five of whom shall constitute a quorum".

Article XIII, sec. 8(*a*), provides that "upon the recommendation of the majority of the International Executive Committee" the president may order an investigation of a local.

Article XIII, sec. 8(*b*), provides that under certain conditions (which may be assumed to exist) the president "may appoint a trustee with the consent of the International Executive Committee".

At the meeting of the committee to consider the affairs of local 2 the international president's recommendation to appoint a trustee came to a vote. The committee consists of 11 members; all were present. By a voice vote, which was recorded, four voted aye, three nay and three abstained, the president having no voice except in case of a tie.

It is obvious, therefore, that "the majority of the International Executive Committee" did not vote aye, but only four out of 10.

Apparently believing that the motion had carried to accept and approve the president's recommendations, another motion to consent to the appointment of a trustee was made. This was an aye and nay vote, the names being unrecorded, and the president testified before me that all present voted aye, with one abstaining. This motion was superfluous and ineffective

if the prior motion to adopt the president's recommendations failed.

Defendants now argue that the motion on the recommendations carried because, while 10 members were present, only seven voted, and of those seven a majority of four voted aye. I am asked, in short, to rewrite the constitutional provision to read, "the majority of the International Executive Committee present and voting".

It should be noted that the provision for "the majority of the . . . Committee" to vote applies to ordering an investigation, that the appointment of a trustee must be "consented" to by the committee and that the president's recommendation was to appoint a trustee if the committee consented. It is unthinkable that the "consent" to the appointment of a trustee should be had by a less stringent voting requirement than the ordering of an investigation. A trustee has terrible powers; he can set aside a local's officers and take over the full management of its affairs. This is far more severe than merely investigating to determine whether a trustee is necessary. The "consent" must be expressed by some method, and since the constitution is not clear on the point, I hold that it must be expressed by the same method as that required in deciding whether or not to order an investigation, i. e., "by the majority of the . . . Committee".

I also hold that this phrase is simple and clear as it stands and requires a vote of six members.

"Majority" means more than half, and to substitute its dictionary meaning, the phrase reads: "the more-than-half of the . . . Committee". It was written by laymen, but that fact alone gives a court no right to avoid a clear and simple meaning and to find a more complex one merely because the lay draftsmen were unexpectedly lucid. It may be that these draftsmen meant a majority based on those "present and voting",

for whatever reasons of convenience, but they did not say so and in fact said something else that is clear on its face. Against the awful powers of a trustee and the deep importance of appointing one, I cannot adopt an interpretive construction against a plain one.

We are dealing with a small and powerful committee which acts in executive capacity, and its powers are delegated to it by the membership. We are not dealing with the membership itself. The locals are closer to the membership than the committee, and any necessary construction should favor them. Nor are we dealing with elections, and defendants have cited many such cases. An election involves special ideas. It involves the discovery of the popular will by a vote, and except for rare and imperative reasons an election is not held twice. As an official and final act it often becomes necessary to meet the practicality of the situation, even to construing "majority" in various ways. Even when an election is effected by a small group or a committee, the basic idea is the same, and it is in the public interest generally that elections should be effective and should not be made ineffective or impossible by the abstention of the voters. If they are not interested enough to show up and vote they must take the consequences; officials and officers must be brought to power somehow and business carried on. This is a far cry from taking an action that may chop a local union's head off. Hence I regard the election cases cited by both sides as inapposite.

My distinction is well stated in Krause v. Sander, 66 Misc. 601, 122 N. Y. S. 54 (1910), in which a member of a labor union was expelled. The constitution required a "two-third majority" vote. Of 250 members present, 128 voted for expulsion and none against, and the vote was held insufficient. The court said:

"The rule of law, as I understand it, is that, when the determination of a question is committed to a

board or committee of definite members who act by delegated powers under a provision that their act shall be by a majority or two-thirds, this means a majority or two-thirds of all the members of the board or committee. Loubat v. LeRoy, 40 Hun., 546. But where the decision of a question is committed to a body of undefined members who act by original and not delegated powers, a majority or two-thirds means a majority or two-thirds of those who participate in the election. May v. Bermel, 20 App. Div. 53 [46 N. Y. Supp. 622]."

As this is an informal discussion in the interest of saving time, the law will not be labored. For further authority see Commonwealth v. Wickersham, 66 Pa. 134 (1870) ; Berlin Nominations, 22 Pa. C. C. 615 (1898) ; Rogers v. Boston Club, 205 Mass. 261 (1910).

Much point has been made of the case of Schlichter v. Keiter, 156 Pa. 119 (1893), but it can be dismissed with the observation that it involved an action by "two-thirds of the whole society". The whole society was some 200,000 members, of whom 70,000 responded, and it was held that a two-thirds expression of these was sufficient. While the court did not say so in terms, it was obviously a practical situation in which the action could have been defeated by apathy and involved a fundamental matter in which inaction could destroy the whole corporate purpose. Something had to give.

I am not impressed by the argument that the abstainers should not be counted but only those who voted, and even less by the idea that because Roberts' Rules of Order suggests that an abstainer is held to accept the will of those who vote, his abstention must be counted with the majority as a vote. This latter notion was put forth by the international president, who has the right under the constitution to interpret it. His interpretations do not bind a court. It is one

thing to accept a verdict, but quite another to be counted as having voted for it after having deliberately abstained.

Nor do I see that the different wording of the requirement for a strike vote makes any difference. This, in article XI, sec. 6, is that between conventions the international executive committee may recommend calling a strike by "a majority affirmative vote". Counsel argues that the words "affirmative vote" clearly require a vote of six ayes out of 11 members, and that the absence of these words in the requirement of voting for an investigation or the consent to the appointment of a trustee is a clear indication that less than six votes are required but only a majority of those present and voting.

We may admit that a strike vote is the most important of all union votes and might be expected to require a numerical majority of the whole unit. But defendants' argument leads them into a basic absurdity. They do not argue, as indeed they could not, that even the committee's ordinary business could be executed by a vote of less than a majority of a quorum, namely, three out of five. But under their "present and voting" argument, five could meet, four abstaining and one cast a legal vote. This absurdity becomes the more apparent in the instant case, because 11 met, and if 10 had abstained, one could have voted legally both for the investigation and for the appointment of the trustee. To put these grave actions on a par with ordinary business could not have been intended and obviously was not. This would do such violence to reasonable corporate procedures that it does far less harm to declare that the word "affirmative" in the strike vote requirement adds nothing. It makes better sense to put a strike vote on a par with a vote to appoint a trustee than it does to put the trustee vote on a par with ordinary business.

I therefore hold that the vote of four ayes on the crucial resolution was insufficient.

## Decree Nisi

And now, September 17, 1955, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

1. The International Organization Masters, Mates and Pilots of America, Inc., its agents and representatives, are enjoined from transacting any business in the Port of Philadelphia except through the National Organization Masters, Mates and Pilots of America, Local No. 2, as has been the custom heretofore.

2. The International Organization Masters, Mates and Pilots of America, Inc., is enjoined from continuing in operation the office located at 17 North 4th Street, in Philadelphia.

3. The International Organization Masters, Mates and Pilots of America, Inc., is hereby enjoined from demanding, requesting and directing that steamship companies, agents and other maritime business operators refuse to transact any business with National Organization Masters, Mates and Pilots of America, Local No. 2, and its officers and agents, and particularly from demanding, directing or requesting that the steamship companies, agents and other maritime business operators refuse to accept for employment, licensed dock operators from National Organization Masters, Mates and Pilots of America, Local No. 2, and from in any other way interfering with the rights of the members of said local to obtain employment.

4. The National Organization Masters, Mates and Pilots of America, Local No. 2, and its officers are enjoined from preventing or interfering with the president of the International Organization Masters, Mates and Pilots of America, Inc., in making an investigation of the affairs of the local or from interfering

with such persons as he may bring with him to give him advice or assistance in connection with the examination, and the said local and its officers are required to give such president such assistance as he may require in the making of such investigation, including the use of the premises for himself and his assistants in making said investigation.